1  COOLEY LLP
   MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
2  MATTHEW D. BROWN (196972) (brownmd@cooley.com)
   BENJAMIN H. KLEINE (257225) (bkleine@cooley.com)
3  KATHLYN A. QUERUBIN (275085) (kquerubin@cooley.com)
   101 California Street, 5th Floor
4  San Francisco, CA  94111-5800
   Telephone:     (415) 693-2000
5  Facsimile:     (415) 693-2222

6  Attorneys for Defendant LinkedIn Corporation

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                 SAN JOSE DIVISION

11

12                                              Case No. 12-CV-3088 EJD

13   IN RE LINKEDIN USER PRIVACY LITIGATION      **DEFENDANT LINKEDIN CORPORATION'S
                                                 MOTION TO DISMISS PLAINTIFF'S
14                                               SECOND AMENDED CONSOLIDATED
                                                 CLASS ACTION COMPLAINT**

15                                              Courtroom:  4 (5th Floor)
16                                              Judge:      Hon. Edward J. Davila
                                                Date:       November 8, 2013
17                                              Time:       9:00 a.m.
                                                Trial Date: None Set
18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................ 1

STATEMENT OF RELIEF SOUGHT ................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I. INTRODUCTION ................................................................................................... 1

II. STATEMENT OF FACTS ..................................................................................... 3

    A. LinkedIn and the Hacking Attack on LinkedIn ........................................... 3

    B. LinkedIn's User Agreement and Privacy Policy ......................................... 4

    C. Premium Accounts and LinkedIn's Terms of Service ................................ 6

    D. Plaintiff Khalilah Wright ............................................................................ 6

    E. The Allegations in Previous Complaints ..................................................... 7

    F. The SAC ...................................................................................................... 8

III. APPLICABLE STANDARDS ............................................................................... 9

IV. ARGUMENT ......................................................................................................... 11

    A. Plaintiff Lacks Article III Standing (All Counts)....................................... 11

        1. Plaintiff has not alleged injury in fact resulting from LinkedIn's alleged failure to use "industry standard protocols and technology.".......11

        2. Plaintiff does not plausibly allege that she did not receive all of the benefits that she bargained for ............................................................... 15

        3. Plaintiff's allegation that LinkedIn failed to use industry standards to encrypt member passwords is conclusory and unsupported ................. 19

        4. Plaintiff's claim-specific damage theories do not support standing ......... 20

    B. Plaintiff Fails to State a Claim Under the UCL (Counts 1 and 2) ........................ 21

        1. Plaintiff does not have standing under the UCL ...................................... 21

        2. Plaintiff fails to state a claim under the UCL........................................... 22

    C. Plaintiff Fails to State a Claim for Breach of Contract (Count 3)........................ 23

        1. Plaintiff does not plead legal "damages." ................................................ 23

        2. Plaintiff does not plead damages "resulting from" the breach................. 25

    D. Plaintiffs' Claims Should Be Dismissed With Prejudice. ..................................... 25

V. CONCLUSION ...................................................................................................... 25

Cooley LLP
Attorneys At Law
San Francisco

i.

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allen v. City of Beverly Hills,*
911 F.2d 367 (9th Cir. 1990)..................................................................... 25

*Allen v. Wright,*
468 U.S. 737 (1984) ....................................................................................... 9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................... 10, 15, 22

*Barron v. Reich,*
13 F.3d 1370 (9th Cir. 1994)..................................................................... 20

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................... 10, 15

*Boysen v. Walgreen Co.,*
No 11-cv-6262, 2012 WL 2953069 (N.D. Cal. July 19, 2012)................. 14

*Brown v. Grimes,*
192 Cal. App. 4th 265 (2011) ............................................................... 24, 25

*Californians for Disability Rights v. Mervyn's, LLC,*
39 Cal. 4th 223 (2006) ............................................................................... 21

*Camacho v. Auto Club of S. Cal.,*
142 Cal. App. 4th 1394 (2006) ................................................................. 22

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
20 Cal. 4th 163 (1999) ............................................................................... 22

*Colwell v. Dep't of Health and Human Servs.,*
558 F.3d 1112 (9th Cir. 2009)..................................................................... 9

*Cornerstone Christian Schs. v. Univ. Interscholastic League,*
563 F.3d 127 (5th Cir. 2009)..................................................................... 10

*Coughlin v. Blair,*
41 Cal. 2d 587 (1953) ............................................................................... 24

*Doe I v. Wal-Mart Stores, Inc.,*
572 F.3d 677 (9th Cir. 2009)..................................................................... 10

*First Commercial Mortg. Co. v. Reece,*
89 Cal. App. 4th 731 (2001) ..................................................................... 23

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Gautier v. Gen. Tel. Co.*,
234 Cal. App. 2d 302 (1965) ............................................................................ 23

*Gomez v. Cal. Physician's Serv.*,
299 Fed. Appx. 687 (9th Cir. 2008) ................................................................. 10

*Hamilton v. Greenwich Investors XXVI, LLC*,
195 Cal. App. 4th 1602 (2011) ........................................................................ 20

*Hinojos v. Kohl's Corp.*,
--- F.3d ---, No. 11-cv-55793, 2013 WL 2159502 (9th Cir. May 21, 2013) .......... 13

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ................................................................... 20, 22

*Kwikset Corp. v. Super. Ct.*,
51 Cal. 4th 310 (2011) ........................................................... 12, 13, 14, 21

*Lee v. City of L.A.*,
250 F.3d 668 (9th Cir. 2001) ........................................................................... 20

*Lewis v. Casey*,
518 U.S. 343 (1996) ........................................................................................ 10

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003) ......................................................................... 10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................................... 9, 10

*McBride v. Boughton*,
123 Cal. App. 4th 379 (2004) .......................................................................... 24

*In re McNeil Consumer Healthcare, et al., Mktg. & Sales Practices Litig.*,
877 F. Supp. 2d 254 (E.D. Pa. 2012) ............................................................... 14

*People v. Martinson*,
188 Cal. App. 3d 894 (1986).............................................................................. 24

*Pinel v. Aurora Loan Servs., LLC*,
814 F. Supp. 2d 930 (N.D. Cal. 2011) .............................................................. 23

*Shroyer v. New Cingular Wireless Servs., Inc.*,
622 F.3d 1035 (9th Cir. 2010) ......................................................................... 10

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998)...............................................................25

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ...................................................................................9

*Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*,
594 F.2d 730 (9th Cir. 1979).....................................................................9

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods.
Liab. Litig.*,
790 F. Supp. 2d. 1152 (C.D. Cal. 2011) ................................................13

*White v. United States*,
601 F.3d 545 (6th Cir. 2010)...................................................................10

*Whitmore v. Ark.*,
495 U.S. 149 (1990)...................................................................................9

*Whitson v. Bumbo*,
No. 07-cv-5597, 2009 WL 1515597 (N.D. Cal. Apr. 16, 2009)...............13

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const. art. III ........................................................................... passim

Cal. Bus. & Prof. Code
§§ 17200 *et seq.* ......................................................................................9
§ 17204.....................................................................................................21
§ 22576.......................................................................................................9

Cal. Civ. Code
§ 3300...........................................................................................23, 24, 25

Federal Rules of Civil Procedure
Rule 9(b) ............................................................................................20, 22
Rule 12(b)(1)................................................................................................1, 2
Rule 12(b)(6)....................................................................................... passim

**OTHER AUTHORITIES**

NIST, *March 2006 Policy on Hash Functions* ...........................................19

Elaine Barker & Allen Roginsky, NIST Special Publication 800-131A, *Transitions:
Recommendation for Transitioning the Use of Cryptographic Algorithms and Key
Lengths* (Jan. 2011)............................................................................19, 20

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv.

**MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)**

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Arthur L. Corbin, et al., 11-55 *Corbin on Contracts* (2012)..............................................24

Joseph M. Perillo, et al., *Calamari and Perillo on Contracts* (6th ed. 2009) ..............................25

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v.

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

**NOTICE OF MOTION AND MOTION TO DISMISS**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 8, 2013 at 9:00 a.m. or as soon thereafter as this motion may be heard in the above-entitled court, located at 280 South 1st Street, San Jose, California, in Courtroom 4, Defendant LinkedIn Corporation ("LinkedIn") will move to dismiss Plaintiff's Second Amended Consolidated Class Action Complaint ("Second Amended Complaint" or "SAC"). LinkedIn's Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request for Consideration of Documents Incorporated into the Complaint and for Judicial Notice filed herewith, the Declaration of Eric Heath ("Heath Decl.") and exhibits thereto filed herewith, all pleadings and papers on file in this matter, and such other matters as may be presented to this Court at the hearing or otherwise.

**STATEMENT OF RELIEF SOUGHT**

LinkedIn seeks an order, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), dismissing with prejudice the SAC and each of its causes of action for lack of standing and failure to state a claim upon which relief can be granted.

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether Plaintiff has standing under Article III of the U.S. Constitution.

2.      Whether the SAC states a claim upon which relief can be granted.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

This strike suit arises from the criminal intrusion into LinkedIn's computer systems and the subsequent posting of approximately 6.5 million stolen, hashed LinkedIn member passwords on a Russian hacker website. Despite a succession of complaints, rotating named plaintiffs, and the guidance of the Court's March 6, 2013 order dismissing the previous complaint, no LinkedIn member has yet come forward with any allegation of actual harm, identity theft, loss of money or property, or other cognizable theory of injury caused by the criminal intrusion, the posting of the passwords, or LinkedIn's alleged use of SHA-1, unsalted encryption.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.

**MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)**

In the SAC, the third iteration of the complaint following consolidation, only one Plaintiff and one theory of harm remain: Plaintiff Khalilah Wright alleges that when she upgraded her basic, free account to a premium account, she overpaid due to LinkedIn's failure to use salted, SHA-2 encryption for LinkedIn member passwords, which, according to her, breached a provision in LinkedIn's Privacy Policy. Wright does not allege *any* harm other than her allegation that she overpaid. She does not allege that the criminal password theft resulted in or will result in any harm to her; indeed, she does not even allege that her password was stolen. She does not allege that the use of unsalted, SHA-1 encryption caused her any harm. In short, she does not allege that anything would be different for her had LinkedIn used the allegedly required salted, SHA-2 encryption. She simply believes that she overpaid without being able to tie the alleged breach of contract to any resulting harm to her.

The SAC should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing. First, Plaintiff still fails to allege *any* concrete injury resulting from LinkedIn's security methods or its purported failure to disclose its security methods to its members. Second, because a specified level of security is not a part of the bargain that members enter into with LinkedIn when they agree to pay for upgraded services, Plaintiff fails to allege that she did not receive all the benefits she paid for. Third, Plaintiff fails to support her allegation that LinkedIn did not use industry standards to encrypt member passwords. Fourth, Plaintiff fails to allege any damages *resulting from* LinkedIn's alleged breach of its Privacy Policy. Any one of these deficiencies, by itself, is a sufficient ground for dismissal of the SAC.

Independently, the SAC should be dismissed under Rule 12(b)(6) for failure to state a claim. Plaintiff's Unfair Competition Law claims fail because, among other deficiencies, she (1) fails to allege injury in fact or lost money or property as result of LinkedIn's alleged misrepresentation and unfair competition, (2) fails to plead her fraud-based claim with particularity, and (3) fails to plead sufficient non-conclusory allegations to support an unfair-prong claim. Plaintiff's breach of contract claim also fails because she does not allege legal damages *resulting from* LinkedIn's alleged breach of contract.

Plaintiffs have filed multiple post-consolidation amended complaints and have been given

Cooley LLP
Attorneys At Law
San Francisco

2.

Mot. to Dismiss Plaintiff's
Second Amend. Consol. Compl.
(Case No. 12-CV-3088 EJD)

the Court's views in the last order of dismissal. Because they are still unable to allege cognizable injury or to state a claim, dismissal now should be with prejudice.

## II. STATEMENT OF FACTS[1]

### A. LinkedIn and the Hacking Attack on LinkedIn.

LinkedIn operates the website at www.linkedin.com, which provides an online community for professional networking. (SAC ¶¶ 2, 17.) LinkedIn is available at no cost to anyone age 18 or older who wants to join. A prospective member registers for an account by providing LinkedIn with a name, email address, and password. (*Id.* ¶ 18.) Registered members use their email address and password to log into their LinkedIn accounts, where they can create professional "profiles" containing information such as educational and employment history. (*Id.*)

Plaintiff alleges that a criminal intrusion was discovered on June 6, 2012 when hackers posted approximately 6.5 million encrypted passwords on a Russian hacker website. (*Id.* ¶¶ 37, 39.) Unlike the First Amended Complaint (First Am. Consolidated Class Action Compl., Nov. 26, 2012, Dkt. No. 54 ("FAC")), in which Plaintiffs had alleged "on information and belief" that email addresses *may* also have been taken (FAC ¶ 29 & n.8), Plaintiff has dropped this allegation from the SAC. Thus, Plaintiff alleges only that *encrypted* passwords for *some* LinkedIn members—and no other member information—was stolen.

At the time the criminal intrusion was detected, LinkedIn had recently changed its password encryption method from a system that stored passwords in a hashed format to one that both salted and hashed passwords.[2] (SAC ¶ 40.) While Plaintiff alleges that salting and hashing "together" is the "preferred industry practice" (*id.* ¶ 36), the encryption technique used by LinkedIn for member passwords did not contribute to the hacker's ability to gain access to LinkedIn's systems (*see id.* ¶ 37 (alleging breach occurred through SQL injection attack)).

Nowhere in the SAC does Plaintiff allege that her password was stolen. Furthermore, as

---

[1] This statement is based on the allegations in the SAC, which LinkedIn does not admit.

[2] According to the SAC, information is "salted" by "concatenating a plaintext password with a series of randomly generated characters prior to hashing." (SAC ¶ 32.) Information is "hashed" by "applying a one-way function or algorithm to it." (SAC ¶ 33.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

with the earlier complaints, Plaintiff does not allege any of the following: (a) that her password—let alone *any* member's password—was improperly used by a third party, (b) that any third party has improperly accessed her or any other member's LinkedIn account as a result of the password theft, (c) that any third party has improperly accessed her or any other member's LinkedIn account as a result of the allegedly inadequate encryption of members' passwords, (d) that any member has suffered any harm directly resulting from the password theft, (e) that any member has suffered any harm directly resulting from the allegedly inadequate encryption, or (f) that *any* harm is likely to occur.

### B.    LinkedIn's User Agreement and Privacy Policy.

When prospective members first register (sign up) for an account, they must click a button labeled "Join Now," which confirms that they agree to be bound by the terms of LinkedIn's User Agreement ("User Agreement") and Privacy Policy ("Privacy Policy"). (SAC ¶¶ 18-20.)

In the SAC, Plaintiff cites the version of the User Agreement and Privacy Policy that applied on April 30, 2013 (*see, e.g.*, SAC ¶ 6 & n.1, ¶ 28 & n.5), which went into effect on and are dated June 16, 2011 (*see* Heath Decl. ¶ 7, Exs. B, C). But because Plaintiff alleges that she upgraded to premium services in "March 2010" (SAC ¶ 12), LinkedIn also includes discussion of the versions of the User Agreement and Privacy Policy dated January 22, 2009 (which applied until March 23, 2010) (Heath Decl. ¶ 8, Exs. D, E) and dated March 24, 2010 (which applied until June 16, 2011) (*id.* ¶ 9, Exs. F, G), which are potentially applicable to Plaintiff's claims.[3]

All three of these versions of the Privacy Policy (i.e., the January 22, 2009, March 24, 2010, and June 16, 2011 versions) briefly described[4] how LinkedIn maintained its members' personal information. While the SAC quotes only one statement regarding security (*see, e.g.*, SAC ¶¶ 28, 70), the Privacy Policy actually provided substantial additional detail on what security measures LinkedIn employed. First, in the "Highlights" section at the top of the Privacy

---

[3] The User Agreement and Privacy Policy are incorporated by reference into the SAC and/or can also be judicially noticed. (*See* concurrently filed Request for Consideration of Documents Incorporated into the Complaint and for Judicial Notice (the "RJN").)

[4] LinkedIn refers to these privacy policies in the past tense because on May 13, 2013, after the filing of the SAC, LinkedIn amended its User Agreement and Privacy Policy.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4.

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

Policy, all three versions contain a "Security" highlight, although the March 24, 2010 and June 16, 2011 versions included two additional sentences, which have been underlined for clarity:

| January 22, 2009 version | March 24, 2010 and June 16, 2011 versions |
|---|---|
| Personal information you provide will be secured with industry standards and technology. | Personal information you provide will be secured in accordance with industry standards and technology.  <u>Since the internet is not a 100% secure environment, we cannot ensure or warrant the security of any information you transmit to LinkedIn.  There is no guarantee that information may not be accessed, copied, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards.[5]</u> |

(Heath Decl. Exs. B, E, G.)

In the main body of the Privacy Policy,[6] all three versions included a further explanation of "industry standard protocols and technology" under the "Security" section, although the March 24, 2010 and June 16, 2011 versions contained two additional sentences, which have been underlined for clarity:

| January 22, 2009 version | March 24, 2010 and June 16, 2011 versions |
|---|---|
| In order to secure your personal information, access to your data on LinkedIn is password-protected, and sensitive data (such as credit card information) is protected by SSL encryption when it is exchanged between your web browser and the LinkedIn website.  To protect any data you store on our servers, we also regularly audit our system for possible vulnerabilities and attacks and we use a tier-one secured-access data center.  It is your responsibility to protect the security of your login information.  Please note that emails and instant messaging and similar means of communication with other users of LinkedIn are not encrypted, and we strongly request you not to communicate any confidential information through these means. | In order to help secure your personal information, access to your data on LinkedIn is password-protected, and sensitive data (such as credit card information) is protected by SSL encryption when it is exchanged between your web browser and the LinkedIn website.  To protect any data you store on our servers, LinkedIn also regularly audits its system for possible vulnerabilities and attacks, and we use a tier-one secured-access data center.  <u>However, since the internet is not a 100% secure environment, we cannot ensure or warrant the security of any information you transmit to LinkedIn.  There is no guarantee that information may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards.  It is your responsibility to protect</u> |

---

[5] The words "in accordance" and "copied" do not occur in the March 24, 2010 version of the Privacy Policy.

[6] The "Introduction" to the full Privacy Policy in the March 24, 2010 and June 16, 2011versions also stated, in part: "Of course, maintaining your trust is our top concern, so we adhere to the following principles to protect your privacy: . . .  All information that you provide will be protected with industry standard protocols and technology."  (Heath Decl. Exs. B, G.)

|   | the security of your login information. Please note that emails, instant messaging, and similar means of communication with other Users of LinkedIn are not encrypted, and we strongly advise you not to communicate any confidential information through these means. |
|---|---|

(Heath Decl. Exs. B, E, G.)

After registering, members can access the User Agreement and Privacy Policy by clicking on links located on virtually every page on the LinkedIn website. (*Id*. ¶ 4.)

### C. Premium Accounts and LinkedIn's Terms of Service.

Once registered, members may opt to upgrade their free, basic account to a paid "premium account" for a monthly fee. (SAC ¶ 19.) Premium accounts provide members with enhanced tools such as premium search features, additional search alerts, and extra folders to manage and save searches. (*Id.*) When members upgrade to a premium account, they do not agree to any new User Agreement or Privacy Policy. Instead, members agree to a few terms relating to payment for the premium account; the same User Agreement and Privacy Policy that had applied to the member before paying for LinkedIn's premium services continue to apply after that member upgrades to the premium account. In March 2010, at the time Plaintiff Wright upgraded her account (*id.* ¶ 12), members were not shown any document entitled "Terms of Service." (Heath Decl. ¶¶ 10-11, Ex. H.) Members were required only to enter their payment information, agree to a few select terms relating to payment, and then click a "Buy Now" button. (*Id*. ¶ 10, Ex. H.) Presently, upgrading members are shown a document entitled "Terms of Service," but, as in 2010, the only new terms in the Terms of Service relate to payment for the premium services. The remainder of the Terms of Service document merely re-displays the same User Agreement to which they had already agreed when, as prospective members, they initially registered for a LinkedIn account. (*See* SAC ¶¶ 18-20; *see also* Heath Decl. ¶ 6, Ex. A.)

### D. Plaintiff Khalilah Wright.

The SAC includes allegations regarding only one named plaintiff, Khalilah Wright. Wright alleges that she is a resident of Virginia, and she alleges that she paid for LinkedIn premium services between March 2010 and approximately August 2010—i.e., ending almost two

years before the disclosure of the password theft.  (SAC ¶ 66.)  She alleges that she read and agreed to the Terms of Service and Privacy Policy when she upgraded to premium services (*id.* ¶¶ 67, 70) (even though the Terms of Service were not on the site in March 2010 (Heath Decl. ¶¶ 10-11, Ex. H)).  Wright does not allege that her LinkedIn password was ever stolen.  Nor does she allege that her password was ever decrypted or used by any unauthorized person.  She does not allege any harm resulting from the breach of LinkedIn's systems, does not allege any harm resulting from LinkedIn's alleged failure to use industry standard encryption on members' passwords, and does not even allege that any such harm is likely to occur to her.

### E. The Allegations in Previous Complaints.

The procedural background of this case is a merry-go-round of allegations and plaintiffs, with counsel adding and dropping theories, plaintiffs, and claims at every turn.  The Consolidated Class Action Complaint (Sep. 19, 2012, Dkt. No. 49) ("Cons. Compl.")) named two plaintiffs, Katie Szpyrka (a paying member) and Scott Shepherd (a non-paying member) (both conspicuously missing now), who brought a plethora of claims based on alleged injuries incurred in connection with the theft and posting of the encrypted passwords online.  (Cons. Compl. ¶¶ 1-8.)  Plaintiffs alleged two putative classes consisting of (a) paying and non-paying LinkedIn members whose "personal information was compromised as a result of the data breach," and (b) LinkedIn members who purchased premium services.  (*Id.* ¶ 45.)

After LinkedIn filed a motion to dismiss the Consolidated Complaint (Nov. 5, 2012, Dkt. No. 51), Plaintiffs, rather than oppose the motion, filed a First Amended Complaint.  The FAC removed Shepherd and the class of non-paying members he purported to represent.  In his place, Plaintiffs added Wright (who, like Szpyrka, allegedly paid LinkedIn for premium services).  Plaintiffs abandoned their claim for damages stemming from alleged exposure to a heightened risk of identity theft, although they attempted to revive this argument in their Opposition to LinkedIn's Motion to Dismiss the FAC despite the lack of supporting allegations.  (*See* Pls' Opp'n to Def.'s Mot. to Dismiss the FAC 10, Jan. 22, 2013, Dkt. No. 64.)  Plaintiffs added an allegation they were injured in the form of the loss of the benefit of their bargain (i.e., alleged overpayment for LinkedIn's premium services) and in the diminution in value of the personal

information they provided to LinkedIn. (FAC ¶¶ 35, 43-45, 51-53.) LinkedIn moved to dismiss the FAC. (Def.'s Mot. to Dismiss Pls.' FAC, Dec. 20, 2012, Dkt. No. 59.)

In its March 6, 2013 order dismissing the FAC, the Court rejected Plaintiffs' theories of economic injury, holding that Plaintiffs lacked standing under Article III. (Order Granting Def. LinkedIn's Mot. to Dismiss the FAC 5, Mar. 6, 2013, Dkt. No. 72 ("Dismissal Order").) First, the Court held that Plaintiffs did not "sufficiently demonstrate that included in Plaintiffs' bargain for premium membership was the promise of a particular (or greater) level of security that was not part of the free membership." (*Id*. at 6.) Second, the Court held that Plaintiffs failed to allege that they actually read LinkedIn's Privacy Policy, which contained LinkedIn's statement that it would use "industry standard protocols and technology" to protect member data. (*Id*.) Third, the Court found that Plaintiffs failed to allege an essential element of a contract claim: legal damages resulting from the breach of contract. (*Id*. at 6-7.) Fourth, the Court held that Plaintiffs failed to allege that they suffered "something more" than mere overpayment for LinkedIn's promised security services. (*Id*. at 7.) Finally, the Court rejected Plaintiffs' contention that they were subject to an "increased risk of future harm" as a result of the criminal intrusion into LinkedIn's systems. (*Id*. at 8.) Accordingly, the Court found that Plaintiffs had failed to meet the requirements for Article III standing and dismissed the FAC without prejudice.

### F. The SAC.

In the SAC, the only remaining plaintiff, Wright, fails to address most of the deficiencies the Court identified in its Dismissal Order. Plaintiff abandons *all* allegations of injury resulting from the data breach: she does not even allege that her password was stolen, let alone that it was posted online, decrypted, or used in some unauthorized way. Instead, she alleges only that LinkedIn breached its promise to use industry-standard protocols and technology by using an "outdated" SHA-1 encryption method and by not salting passwords. (SAC ¶¶ 41-46, 91.) Plaintiff claims that LinkedIn's failure to disclose to members that it used unsalted, SHA-1 encryption (*id.* ¶¶ 10-11) caused her to suffer injury in the form of receiving a "less useful and less valuable" service than what she paid for (*id.* ¶¶ 10, 11, 65, 74-76). Wright, who upgraded to a premium account only from March to August 2010 (*id.* ¶ 66), long before the breach occurred,

seeks to represent a putative class of "[a]ll individuals and entities in the United States who paid a monthly fee to LinkedIn for a Premium Subscription at any point between March 15, 2006"—the point at which the U.S. government allegedly "abandoned" the SHA-1 hashing algorithm (*id.* ¶ 41)—"and June 7, 2012"—the day after the alleged data breach was disclosed (*id.* ¶ 77).

Plaintiff has abandoned most of the causes of action from the earlier complaints. The SAC now alleges only three claims: (i) a claim under the California Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL"), based on "LinkedIn's failure to disclose its substandard security practices" (SAC ¶ 102; *see also id.* ¶¶ 89, 92, 98, 103), (ii) a claim under the UCL's "unlawful" prong for violation of the California Online Privacy Protection Act, Business & Professions Code § 22576 ("CalOPPA"), and (iii) a breach of contract claim.

## III.   APPLICABLE STANDARDS

Unless a plaintiff establishes standing under Article III of the U.S. Constitution, a federal court does not have subject matter jurisdiction to hear the case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998). A defendant may challenge standing through a Rule 12(b)(1) motion and may either attack the complaint on its face or the existence of jurisdiction in fact. *See Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 732-33 (9th Cir. 1979). If a complaint does not establish standing, a federal court must dismiss the case. *See Steel Co.*, 523 U.S. at 101-02. The burden of establishing standing rests on plaintiffs. *Colwell v. Dep't of Health and Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

To have standing under Article III, a plaintiff must allege (i) injury in fact, (ii) that is "fairly traceable to the defendant's allegedly unlawful conduct," (iii) that is "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). An "injury in fact" is "an injury to himself that is 'distinct and palpable' as opposed to merely '[a]bstract,' and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Ark.*, 495 U.S. 149, 155 (1990). Alleged future harms cannot be hypothetical or conjectural; only future harm that is "imminent" and "certainly impending" can constitute injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992); *Whitmore*, 495 U.S. at 158. Moreover, in a putative class action, the named plaintiffs must each establish that they personally have standing

or they may not seek such relief on behalf of the class. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022-23 (9th Cir. 2003).

A court must dismiss a complaint under Rule 12(b)(6) where it fails to allege facts sufficient to support a cognizable legal claim. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (dismissal is proper where "there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory") (citation and quotation omitted). As the Supreme Court has emphasized, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not [survive a motion to dismiss]," and "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (internal quotation marks and citation omitted). Instead, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" which requires that a "plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Furthermore, while a court accepts well-pleaded factual allegations as true, unwarranted conclusions and inferences need not be accepted. *See Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681-83 (9th Cir. 2009) (citing *Twombly* and *Iqbal*).

The "plausibility standard" established by *Twombly* and *Iqbal* applies to questions of standing under Article III. *See Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133-134 (5th Cir. 2009) ("plaintiffs must allege facts that give rise to a plausible claim of . . . standing."); *White v. United States*, 601 F.3d 545, 551-552 (6th Cir. 2010) (applying *Iqbal* plausibility standard to standing on a motion to dismiss); *Gomez v. Cal. Physician's Serv.*, 299 Fed. Appx. 687, 689 (9th Cir. 2008) (finding standing where plaintiff had "alleged sufficient facts establishing the plausibility that he suffered an injury-in-fact"); *Lujan*, 504 U.S. at 561 (each of the elements for standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive states of the litigation").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**ARGUMENT**

### A. Plaintiff Lacks Article III Standing (All Counts).

The SAC simply repackages the already-rejected allegations from the FAC with language about an indivisible "bundle of services" (SAC ¶ 20), an allegedly "new" contract that "cancel[s]" the old User Agreement (*id*.), and members' "reasonable and justified" "expectations" (*id*. ¶ 27). But these reframed allegations do little to rectify the problems the Court identified in the Dismissal Order. *First*, Plaintiff has not (and cannot) show that LinkedIn's alleged failure to use "industry standard protocols and technology" resulted in any harm to her. Instead—as in the FAC—she merely alleges that she overpaid for LinkedIn's premium services, without alleging the "something more" that courts require to establish Article III standing. But without alleging that *something*—*anything*—would be different for her if LinkedIn had used salted, SHA-2 encryption for user passwords, she cannot establish injury in fact. *Second*, Plaintiff does not plausibly allege that she did not receive all of the benefits that she bargained for. Members who purchase premium account upgrades pay for premium services, such as advanced networking tools, not for a particular level of (or greater) security. (Dismissal Order at 6.) Plaintiff's allegations about an indivisible bundle of services and a "new" contract misstate the facts and misread LinkedIn's User Agreement and the premium-service Terms of Use. *Third*, Plaintiff's allegation that LinkedIn failed to use industry standards to encrypt member passwords is conclusory, unsupported, and contradicted by the documents she relies on. *Fourth*, Plaintiff's claim-specific damage theories do not support standing: Plaintiff does not allege any damages *resulting from* LinkedIn's alleged violation of its Privacy Policy. Each of these four deficiencies in the SAC provides an independent ground for dismissal for lack of standing as discussed below.

#### 1. Plaintiff has not alleged injury in fact resulting from LinkedIn's alleged failure to use "industry standard protocols and technology."

Although this case was originally brought as a data breach case seeking to recover damages suffered from the criminal intrusion into LinkedIn's systems, Plaintiff abandoned this theory, tacitly acknowledging that she cannot show actual, imminent, or impending harm resulting from the theft and posting of member passwords. Plaintiff also makes no allegation that

she suffered any harm from the misuse of her password subsequent to the theft, or that any such harm is "imminent" or "certainly impending." She does not even allege in the SAC that her password *was* stolen, let alone that her password was posted online, that it was decrypted, or that a third party used the password in any way. She therefore has not alleged injury in fact as a result of any harm or threatened harm caused by the data breach that would confer Article III standing.

Instead, Plaintiff's allegations of injury focus solely on her alleged overpayment for LinkedIn's premium services because of LinkedIn's alleged failure to use salted, SHA-2 encryption for member passwords. But Plaintiff does not allege that the failure to use the allegedly required level of encryption *caused* any harm to befall her. Plaintiff does not allege, for example, that her password was *stolen* and then *decrypted* as a result of the use of unsalted, SHA-1 encryption. Nor does she allege that anyone *misused* her password as a result of the use of unsalted, SHA-1 encryption. In fact, *Plaintiff does not allege that __anything__ would have been different for her if LinkedIn had used a salted, SHA-2 encryption method*.

Plaintiff's only claimed "injury" is that she allegedly overpaid for LinkedIn's premium services (during 2010—long before any criminal intrusion took place): she claims that because LinkedIn's encryption method allegedly did not meet the "industry standards and protocols" it promised members, and because LinkedIn failed to tell members that its encryption methods were substandard, Plaintiff paid more for the service than she would have. (*See*, *e.g.*, SAC ¶ 76.) But this is the same "benefit of the bargain" theory the Court rejected in the Dismissal Order for lack of standing. Because Plaintiff has still failed to allege the "something more" that courts require in product performance cases such as this one, Plaintiff continues to lack Article III standing.

As briefed and argued extensively on LinkedIn's motion to dismiss the FAC, courts have held that a plaintiff can establish Article III standing based on the deprivation of the "benefit of the bargain" and corresponding overpayment only in two situations, neither of which was adequately alleged in the FAC, and neither of which is adequately alleged in the SAC. *First* are cases based on or following similar reasoning to the California Supreme Court's decision on UCL standing in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011). In these cases, the alleged wrong consists of false advertising—labeling or branding—of a product, where such labels and

brands have "independent economic value." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, 790 F. Supp. 2d. 1152, 1165 n.11 (C.D. Cal. 2011) (citing *Kwikset*, 51 Cal. at 332). In these cases, courts found actual economic harm to the consumer because the consumer paid money for defendant's product over a competitor's product due to the alleged mislabeling. In *Kwikset*, for example, plaintiffs alleged that they purchased locks labeled "Made in U.S.A." but did not receive the "benefit of their bargain" because the locks were actually made in China. 51 Cal. 4th at 332-33. The court held that plaintiffs had alleged standing under the UCL because "[s]imply stated: labels matter. The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source." *Id.* The injury in such cases is that the consumer's motivations and preferences are frustrated by the mislabeling, resulting in the consumer's purchase of defendant's product rather than another brand the consumer would otherwise prefer. *Id.* at 329-30; *see also Hinojos v. Kohl's Corp.*, --- F.3d ---, No. 11-cv-55793, 2013 WL 2159502, at *5 (9th Cir. May 21, 2013) (finding that false advertising regarding the "normal" price of a product is "significant to many consumers in the same way as a false product label would be . . . [which] is *why* retailers like Kohl's have an incentive to advertise false 'sales'") (citation omitted; italics in original).

*Second* are cases where the alleged wrong stems from allegations about insufficient product *performance* (e.g., a defective product or noncompliance with a contractual term), in which courts require plaintiffs to allege "something more" showing they have suffered "independent economic harm," other than their mere allegation that they have overpaid. *Toyota*, 790 F. Supp. 2d. at 1165 n.11 (in non-labeling cases, plaintiff must allege "something more . . . than simply alleging an overpayment for a 'defective' product"); *Whitson v. Bumbo*, No. 07-cv-5597, 2009 WL 1515597, at *4-6, *6 n.4 (N.D. Cal. Apr. 16, 2009) (Patel, J.) (finding no standing under a "benefit of the bargain" theory for the purchase of a baby seat that tended to topple over when placed on raised surfaces because plaintiff had not alleged that she or her baby were actually injured by the seat and had not alleged any "independent economic harm" such as

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

would be present if she had alleged that she needed to purchase a substitute for the seat). For example, in *Boysen v. Walgreen Co.*, No 11-cv-6262, 2012 WL 2953069, at *4 (N.D. Cal. July 19, 2012), plaintiff alleged that he bought fruit juices from defendant and that he had been denied the "benefit of his bargain" because the products contained trace amounts of lead and arsenic. The court found no Article III standing because he had not alleged "that any person has ever been injured by the product" or "that consumption of the products may cause physical harm." 2012 WL 2953069, at *7. Instead, Plaintiff had merely alleged that "he purchased and consumed the fruit juices, but that the levels of lead and arsenic in defendant's product were unsatisfactory to him." *Id.* Similarly, in *In re McNeil Consumer Healthcare, et al., Marketing & Sales Practices Litigation*, 877 F. Supp. 2d 254, 272-73 (E.D. Pa. 2012) (citation and quotation omitted), the court rejected standing on a "benefit of the bargain" theory where plaintiffs claimed they had overpaid for drugs because of quality-control problems, but where plaintiffs themselves had not experienced any problems with the drugs and, other than the allegation of overpayment, plaintiffs could not point to any injury that affected them "in a personal and individual way."

In dismissing the FAC, the Court held that Plaintiffs had not alleged injury in fact under either of these lines of cases, finding that Plaintiffs did not allege a *Kwikset*-type false advertising or labeling case because "[t]his is not the case where consumers paid for a product, and the product they received was different from the one as advertised on the product's packaging." (Dismissal Order at 7.) Instead, Plaintiffs alleged a defective performance case. (*Id.* ("Plaintiffs . . . argue the security services [they received] were defective in some way.").) Thus, the Court held that Plaintiffs must allege "something more" than mere overpayment, which "could be a harm that occurred as a result of the deficient security services and security breach, such as, for example, theft of their personally identifiable information." (*Id.*)

There are no allegations in the SAC that change this analysis. Wright complains that LinkedIn's "security practices" were "substandard" (i.e., defective) (SAC ¶ 55), but she does not allege "something more" than mere overpayment for LinkedIn's premium services. Although Plaintiff has purged the term "benefit of the bargain" from the SAC (despite having made it a centerpiece of the FAC and her opposition to LinkedIn's motion to dismiss the FAC), the only

harm that she alleges related to LinkedIn's use of unsalted, SHA-1 encryption for passwords is overpayment for LinkedIn's premium services.  (*See* SAC ¶¶ 10 ("Had LinkedIn informed its Premium Subscribers that it [used allegedly insufficient encryption methods for passwords] Wright would not have been willing to purchase her LinkedIn Premium Subscription at the price charged, if at all."); 76 ("had LinkedIn disclosed its lax security practices, [Wright] would have viewed the Premium Subscription as less valuable and would either have attempted to purchase a Premium Subscription at a lower price or not at all").)

While Plaintiff includes allegations that "consumers are willing to spend additional money (a premium) in exchange for 'stronger privacy protections, which includes the secure storage of their personal information'" (SAC ¶ 58), that "services with better security practices command higher prices than those without" (*id.* ¶ 61), and that "when calculating the utility of social networking websites, consumers factor stated security practices heavily into their calculations" (*id.* ¶ 63), those allegations do not change the analysis.  Instead, those allegations are merely different ways of saying that Plaintiff alleges she overpaid.

Indeed, the report of Plaintiff's purported expert, Serge Egelman, confirms that Plaintiff's alleged "injury" is nothing more than mere overpayment for LinkedIn's premium services. Specifically, Egelman asserts that if members had known of LinkedIn's allegedly substandard security practices, they "would have demanded refunds and/or canceled their subscriptions, while new potential customers would have declined to pay the subscription price."  (SAC Ex. A-2 at 18.)  Thus, neither the SAC nor Egelman's report supports an argument that Plaintiff suffered a harm "independent" of mere overpayment; they do not show the "something more" that courts require.  Nowhere does Plaintiff allege how her position would be different if LinkedIn had used the allegedly required encryption protocol.  Plaintiff thus lacks Article III standing.

### 2. Plaintiff does not plausibly allege that she did not receive all of the benefits that she bargained for.

The SAC must also be dismissed because Plaintiff's allegations that she did not receive what she paid for when she upgraded to premium services fails the *Iqbal/Twombly* plausibility test.  *See Twombly*, 550 U.S. at 557-58.  Plaintiff alleges that she "paid a monthly fee for the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

combination of LinkedIn's basic features, its premium features, and industry-standard privacy and security measures for protecting her personal information." (SAC ¶ 72.) But, as with the FAC, she fails to allege that the services she bargained to receive when she upgraded to a premium account included "the promise of a particular (or greater) level of security *that was not [already] part of the free membership.*" (Dismissal Order at 6 (emphasis added).)

LinkedIn's premium services provide members with various additional benefits on top of the free, basic services. (SAC ¶ 19.) In exchange for payment of a monthly fee, members gain, for example, enhanced communication and visibility services, better search capabilities, and profile management tools. (*Id.*) But they also retain the basic services that non-paying members already have. (*Id.*; *see also id.* ¶ 20 (describing premium services as "add-ons to the existing LinkedIn service").) The encryption of members' login passwords is the same whether or not they have upgraded to premium memberships. (*See* Heath Decl. Exs. B, E, G (Privacy Policies).)

While Plaintiff cites a premium-membership "Terms of Service" dated June 16, 2011 (*see id.* Ex. A), that document is, on its face, inapplicable to Plaintiff's purchase of premium services, which she alleges occurred in March 2010, i.e., over a year earlier (SAC ¶ 12). In fact, in March 2010, to upgrade to premium services, members merely entered their payment information and clicked a box agreeing to a few sentences of payment terms before clicking on the "Buy Now" button. (Heath Decl. ¶¶ 10-11, Ex. H.) Members were *not* shown any document similar to the "Terms of Service" Plaintiff cites in the SAC that includes a re-display of the User Agreement together with the new payment terms. (*Id.*) Nor were they asked to re-assent to the User Agreement or Privacy Policy while upgrading. (*Id.*) Thus, the exact same User Agreement and Privacy Policy that had applied to the member before paying for LinkedIn's premium services continued to apply after he or she upgraded, and the member did not enter into any new contract during the upgrade process that "canceled" any prior contracts.

But even accepting as true Plaintiff's allegations that the June 16, 2011 "Terms of Service" applied to her March 2010 purchase of premium services, she still has not plausibly alleged that members agree to any new User Agreement or Privacy Policy when they purchase upgraded, premium services. Instead, in exchange for the additional services provided by

LinkedIn, an upgrading member is directed to a premium-membership "Terms of Service" webpage, which consists of a few new terms related to payment, appearing above a re-display of the original User Agreement to which the member had already assented when he or she initially registered for a free, basic LinkedIn account. (*Compare* Heath Decl. Ex. C (User Agreement assented to when initially signing up for free LinkedIn account) *with id.* Ex. A (terms assented to when later upgrading to premium services).) Further, both the User Agreement re-displayed to members when upgrading to premium services and the User Agreement to which prospective members agree when registering for LinkedIn incorporate by reference the *same* Privacy Policy. (*See id.* Ex. A (incorporating Privacy Policy), Ex. C (incorporating Privacy Policy).)

Thus, whether one looks at the contracts in place in March 2010 when Wright alleges she purchased premium services or whether one looks at the contracts in place as of April 30, 2013 as cited in the SAC, the contract that members enter into when upgrading to premium services is payment to LinkedIn in exchange for LinkedIn's provision of additional services such as enhanced networking and searching tools—not for any kind of new promise by LinkedIn to use a particular level of security. (Dismissal Order at 6 ("Thus, when a member purchases a premium account upgrade, the bargain is not for a particular level of security, but actually for the advanced networking tools and capabilities to facilitate enhanced usage of LinkedIn's services.").) The SAC, like the FAC, "does not sufficiently demonstrate that included in Plaintiffs' bargain for premium membership was the promise of a particular (or greater) level of security that was not part of the free membership." (*Id.*)

In an attempt to avoid the consequences of the Dismissal Order's reasoning, Plaintiff now points to contract "integration" language that appears on the premium "Terms of Service" webpage—neglecting to point out that it appears in the re-displayed User Agreement beneath the premium payment terms. She argues that when she purchased a premium account, she entered into a completely new contract that cancelled the previous User Agreement that she had entered into when she signed up as a free member, and therefore, she argues, LinkedIn made a new promise to use industry standard protocols and technology as a part of the premium-services bargain. (SAC ¶¶ 6, 20.) As an initial matter, the "Terms of Service" and the integration

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

language Plaintiff quotes was *not part the upgrade process* in March 2010, and thus the premium membership terms that members entered into when upgrading at that time did not include an integration clause. (*See* Heath Decl. ¶¶ 10-11, Ex. H.) But even under the more recent, June 16, 2011 "Terms of Service" (that are inapplicable to Plaintiff), Plaintiff's strained argument is wrong on two counts. First, the integration clause does not apply to the new premium payment terms that Wright agreed to when she upgraded to premium services. The integration clause appears in the re-displayed User Agreement, beneath the premium "Terms of Service," and provides, in part, "You agree that *this Agreement* constitutes the entire, complete and exclusive agreement between you and us regarding the Services and supersedes all prior agreements and understandings . . . with respect to the subject matter of this Agreement." (Heath Decl. Ex. A (emphasis added); *see also* SAC ¶¶ 6, 20 (partially quoting integration clause but omitting defined term "Agreement").) The term "Agreement" is specifically defined to mean *not* the premium "Terms of Service," but rather "*this LinkedIn User Agreement* and the LinkedIn Privacy Policy, which is hereby incorporated by reference." (Heath Decl. Ex. A (emphasis added).) That is, "Agreement" is defined to mean the contract that Wright had already entered into when she registered for her basic account (the User Agreement, with Privacy Policy incorporated by reference)—and does not include within its definition the new payment terms in the premium "Terms of Service." Accordingly, the integration clause, by its very terms, integrates only the original User Agreement, not the premium "Terms of Service" to which upgrading members later assent. The integration language therefore does not support the notion that the Privacy Policy's statement regarding data security somehow constituted one of the bargained-for benefits when Plaintiff elected to upgrade to a premium account.

Second, even if the integration language could somehow be said to apply to the promise to provide premium services (which, as discussed above, is not the case), it would not change the fact that LinkedIn made *no new promise* relating to security when Wright upgraded to premium services. (*See* Dismissal Order at 6.) Instead, "[a]ny alleged promise LinkedIn made to paying premium account holders regarding security protocols was also made to non-paying members." (*Id.*) Plaintiff had already assented to the terms of the User Agreement (which incorporated the

Cooley LLP
Attorneys At Law
San Francisco

Mot. to Dismiss Plaintiff's
Second Amend. Consol. Compl.
(Case No. 12-CV-3088 EJD)

Privacy Policy by reference) when she became a basic member. Thus, the already-promised statement regarding security was not one of the bargained-for benefits of the upgrade.

Because Plaintiff has not plausibly alleged that she did not receive all of the benefits she paid for, she lacks Article III standing.

**3.    Plaintiff's allegation that LinkedIn failed to use industry standards to encrypt member passwords is conclusory and unsupported.**

Plaintiff also lacks Article III standing because she has not alleged sufficient *facts* to plausibly allege that LinkedIn failed to use industry standard protocols and technology. The centerpiece of Plaintiff's argument is that LinkedIn should not have been using SHA-1 encryption because it had been considered since March 2006 to be "vulnerable to hacking" (SAC ¶ 34 & n.6), and uses this date as the start of her putative class period (SAC ¶ 77). However, Plaintiff never explicitly alleges that SHA-1 was *below* industry standards during the class period. She instead alleges that "the National Institute of Standards and Technology [NIST] *recommended* that all government agencies that all government agencies 'stop using SHA-1.'" (SAC ¶ 35 (emphasis added).) But that does not mean that SHA-1 was not, at the time, still an industry standard. In fact, NIST's statement makes clear that government agencies were not *required* to stop using SHA-1 at all: it was only a recommendation, and only for *some* applications, including for "digital signatures, digital time stamping and other applications that require collision resistance"—not the hashing of passwords. (*See* NIST, *March 2006 Policy on Hash Functions*, *available at* http://csrc.nist.gov/groups/ST/hash/ policy_2006.html.)

Plaintiff's failure to allege that NIST recommended the discontinuation of SHA-1 for password encryption is not an accident. To the contrary, Plaintiff (and her purported expert, Egelman) has conveniently omitted the fact that—to this day—NIST explicitly deems the use of SHA-1 to be acceptable for password hashing. (*See* Elaine Barker & Allen Roginsky, NIST Special Publication 800-131A, *Transitions: Recommendation for Transitioning the Use of Cryptographic Algorithms and Key Lengths* 14 (Jan. 2011), *available at* http://csrc.nist.gov/ publications/nistpubs/800-131A/sp800-131A.pdf (last accessed on June 13, 2013) (stating that for non-digital signature applications, "the use of SHA-1 is **acceptable**" (emphasis in original)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"**includ[ing]** . . . hash-only applications (e.g., **hashing passwords** . . .) . . . .") (emphasis added));

*see also id.* 13 (showing that for non-digital signature generation applications, SHA-1 is "Acceptable" with no transition date recommended or required).)[7]

Thus, Plaintiff's allegations that the government "abandoned" (SAC ¶¶ 41, 45) and "disavowed" (SAC ¶ 75) SHA-1 in 2006, and that it was no longer "industry standard," are simply false. As a result, Plaintiff's core allegation—that LinkedIn misrepresented it would use "industry standards and technology"—should be rejected for failing to meet the *Iqbal/Twombly* plausibility standard, let alone the higher pleading standards imposed by (a) Article III, which makes it Plaintiff's burden to establish standing, and (b) Rule 9(b), which imposes a particularity standard on Plaintiff's claims since they are fundamentally claims about misrepresentation. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1122 (9th Cir. 2009).

## 4.    Plaintiff's claim-specific damage theories do not support standing.

At the hearing on LinkedIn's motion to dismiss the FAC, Plaintiff's counsel asserted that the lawsuit "is primarily based on an alleged breach of contract." (Dismissal Order at 6.) As a result, the Court looked to the elements of the claim for breach of contract and held that "[t]he economic loss Plaintiff alleges—not receiving the full benefit of the bargain—cannot be the 'resulting damages' of th[e] alleged breach." (*Id.* (citing *Hamilton v. Greenwich Investors XXVI, LLC*, 195 Cal. App. 4th 1602, 1614 (2011)).) And the Court concluded that "the economic damages Plaintiffs proffer cannot form the basis of standing for their breach of contract-related claims. . . . Rather, this injury could only have occurred at some point before the breach, at the time the parties entered into the contract." (*Id.*)

Nothing Plaintiff has alleged in the SAC changes this conclusion, and, in fact, Plaintiff now alleges that she signed up for LinkedIn's premium services *in March 2010* and that she cancelled her premium membership (and thus stopped paying money to LinkedIn) in *August 2010*—two years before the criminal intrusion was discovered. (*See* SAC ¶ 12.) Plaintiff's first

---

[7] As discussed more fully in the accompanying RJN, the Court may take judicial notice of this NIST report because it is a public document by an administrative body. *See Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

Cooley LLP
Attorneys At Law
San Francisco

Mot. to Dismiss Plaintiff's
Second Amend. Consol. Compl.
(Case No. 12-CV-3088 EJD)

claim under the UCL (Count 1) is no different from her UCL claim in the FAC, which Plaintiff's counsel represented to the Court "is primarily based on an alleged breach of contract." (Dismissal Order at 6; *see also* Rep.'s Tr. of Proceedings 33:15-19, Feb. 8, 2013 ("Our case centers around" the allegation that LinkedIn "made a promise and didn't follow through," and that "Plaintiffs paid good money, and they should have been afforded all of the protections that they were offered.").) Similarly, Plaintiff's breach of contract claim (Count 3) is the same as her breach of contract claim in the FAC. Counts 1 and 3 should thus be dismissed for the same reason they were dismissed when asserted in the FAC: Plaintiff's allegation that she did not receive the full benefit of her bargain cannot be the "resulting damages" from the alleged breach of contract. (Dismissal Order at 6; *see also infra* at 25.) Furthermore, as discussed below (*infra* at 23-24), Plaintiff's consideration does not constitute legal "damages."

Count 2 is a new claim brought under the UCL "unlawful" prong for violation of CalOPPA, but the alleged violation is literally a breach of contract: Plaintiff alleges that LinkedIn breached its Privacy Policy "knowingly and willfully" or "negligently and materially." (SAC ¶¶ 107-117.) As discussed below, to have standing under the UCL, Plaintiff must allege that she lost money "as a result of" LinkedIn's unfair competition. But her payment of consideration to LinkedIn was not *a result of* LinkedIn's alleged breach of its Privacy Policy.

Plaintiff lacks Article III standing because she has not alleged injury in fact, let alone any injury that is fairly traceable to the alleged wrongful conduct, and the SAC should be dismissed.

**B.    Plaintiff Fails to State a Claim Under the UCL (Counts 1 and 2).**

**1.    Plaintiff does not have standing under the UCL.**

To have standing under the UCL, a plaintiff must have "suffered injury in fact and [have] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; *see also Californians for Disability Rights v. Mervyn's, LLC,* 39 Cal. 4th 223, 227 (2006). UCL standing is more restrictive than Article III standing because it is limited to persons who have "lost money or property" "as a result of" the alleged unfair competition. *Kwikset*, 51 Cal. 4th at 322-24 (the UCL's "narrower" standing requirements include "a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MOT. TO DISMISS PLAINTIFF'S
SECOND AMEND. CONSOL. COMPL.
(CASE NO. 12-CV-3088 EJD)

Plaintiff does not have standing under the UCL for the same reasons that she does not have Article III standing, except, if anything, the arguments apply with even greater force under the UCL's narrower standing requirements.

### 2. Plaintiff fails to state a claim under the UCL.

As an initial matter, as discussed above, because Plaintiff's claim is grounded in fraud and misrepresentation (SAC ¶ 93), Plaintiff must allege her claims with particularity under Rule 9(b). *Kearns*, 567 F.3d at 1122. But Plaintiff never explicitly alleges that the use of SHA-1 encryption is *not* industry standard. To the contrary, the NIST itself has stated that SHA-1 continues to be an appropriate protocol for hashing of passwords. (*See supra* at 19-20.)

Moreover, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. It is not plausible that LinkedIn's members would reasonably believe that the "industry standard protocols and technology" language in the Privacy Policy to mean LinkedIn was providing a 100% guarantee that there would never be a criminal intrusion into LinkedIn's systems or a theft of passwords. This is particularly true when considered in light of the surrounding language in the Privacy Policy, which reminded Users: "However, since the internet is not a 100% secure environment, we cannot ensure or warrant the security of any information you transmit to LinkedIn. There is no guarantee that information may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards." (Heath Decl. Exs. B, G.) Thus, Plaintiff's allegation that LinkedIn acted "fraudulently" as defined by the UCL fails as a matter of law.

Plaintiff also fails to state a claim under the UCL's "unfair" prong. To state a claim for an "unfair" business practice under the UCL, a plaintiff must allege facts establishing (1) substantial consumer injury, (2) that the injury is not outweighed by countervailing benefits to consumers, and (3) that the injury is one that consumers could not reasonably have avoided. *See Camacho v. Auto Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006).[8] As discussed above, Plaintiff has not

---

[8] In *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 185-87 (1999), the court reviewed definitions of "unfair" developed by the lower courts and concluded they were "too

Cooley LLP
Attorneys At Law
San Francisco

pled any injury, let alone a "substantial" one (or, for that matter, an injury that can be "weighed" against countervailing benefits to consumer or not "avoided" by consumers). Furthermore, apart from the lack of injury, Plaintiff has only included a conclusory statement that the alleged injury is not outweighed by countervailing benefits to consumers. (*See* SAC ¶ 102 ("LinkedIn's use of substandard security did not create any benefits sufficient to outweigh the harm it caused.").)[9] Thus, Plaintiff fails to allege sufficient facts to satisfy the *Camacho* test.

### C. Plaintiff Fails to State a Claim for Breach of Contract (Count 3).

To state a claim for breach of contract, a plaintiff must plead four elements: "[1] the contract, [2] plaintiffs' performance (or excuse for nonperformance), [3] defendant's breach, and [4] damage to plaintiff therefrom." *Gautier v. Gen. Tel. Co.*, 234 Cal. App. 2d 302, 305 (1965). Damages are essential to the claim, *see First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001), and must be *a result of* the alleged breach, Cal. Civ. Code § 3300 (damages must be "proximately caused" by the breach); (*see also* Dismissal Order at 7). Plaintiff's breach of contract claim should be dismissed because (1) Plaintiff does not allege legal "damages," but instead seeks restitution of her consideration without alleging a proper basis for restitution, and (2) she does not allege damages that were "proximately caused" by the alleged breach.

### 1. Plaintiff does not plead legal "damages."

As with the FAC, Plaintiff confuses legal damages with the consideration she paid LinkedIn. (*See* SAC ¶¶ 76, 137 (Wright "would have either attempted to purchase a Premium Subscription at a lower price or not . . . at all"); 146 (Wright seeks an "award[] . . . in an amount

---

amorphous and provide[d] too little guidance to courts and businesses." The court adopted a test for competitor actions, but did not decide what test should apply in consumer actions.

[9] Plaintiff's claim also fails under the alternative test for "unfairness"—*see Pinel v. Aurora Loan Servs., LLC,* 814 F. Supp. 2d 930, 940 (N.D. Cal. 2011) ("[a]n unfair business practice under the UCL is 'one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers'") (citation omitted)—, since she makes only the most conclusory of allegations of how LinkedIn's conduct rises to the "oppressive" or otherwise aggravated levels contemplated by the courts. (*See* SAC ¶ 102.) Plaintiff fails to allege any injury, let alone a substantial one, and provides no support for how (a) encryption of passwords using an "unsalted" method of encryption or (b) LinkedIn's failure to disclose that it used the "unsalted" method, meets the aggravated level of "unfair" conduct.

equal to the difference in the free-market value of the secure services [she] paid for and the insecure services [she] received").) The return of the money paid to LinkedIn does not constitute legal "damages" resulting from LinkedIn's alleged breach of the Privacy Policy. *See* Cal. Civ. Code § 3300; *see also Coughlin v. Blair*, 41 Cal. 2d 587, 600 (1953). As explained in *Corbin*, "the measure of damages for a breach of contract . . . is not the amount of the consideration paid by the plaintiff for the defendant's promise," but is instead the "amount [that would] put[] the injured party in as good a position as that party would have occupied had the contract been fully performed by the defendant." Arthur L. Corbin, et al., 11-55 *Corbin on Contracts* § 55.6 (2012). The measure of damages, therefore, is "the amount which will *compensate* the party aggrieved *for all the detriment* proximately caused thereby . . . ." Cal. Civ. Code § 3300 (emphasis added).

Plaintiff does not ask the court to put her in "as good a position as [she] would have occupied had the contract been fully performed"—such a measure of damages would ask how LinkedIn's alleged breach has caused detriment to Plaintiff and compensate them in that amount. Instead, Plaintiff's request for money paid is—at best—a request for restitution of her consideration from LinkedIn. *See People v. Martinson*, 188 Cal. App. 3d 894, 900 (1986) (restitution is "restoration of the status quo by the awarding of an amount which would put plaintiff in as good a position as he would have been if no contract had been made and restores to plaintiff value of what he parted with in performing the contract"). She asks the Court to put her (at least partially) in the position she was in before she entered the contract by restoring the money she paid to LinkedIn. But the Court has already held that the return of her consideration cannot form the basis of standing for her breach of contract claim. (Dismissal Order at 7.) Plaintiff has not alleged the fraud or "total" breach necessary to support a claim for restitution.[10]

---

[10] Any claim for restitution is insufficiently pled because restitution is only available on a contract in two situations: (i) where the contract was procured by fraud or is otherwise unenforceable, *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004) ("[R]estitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason."); or (ii) where the defendant's breach was "total" and plaintiff elects to treat the contract as it if were rescinded, *Brown v. Grimes*, 192 Cal. App. 4th 265, 281 (2011) ("A party is entitled to restitution when the contract has failed, such as when it is void, or has been rescinded or '*the consideration has wholly failed.*' Thus, a failure of performance generally gives rise to a claim for restitution of money had and received

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**2.      Plaintiff does not plead damages "resulting from" the breach.**

A separate reason for dismissal of Plaintiff's claim is that her request for recovery of the consideration paid to LinkedIn does not seek damages *caused by* LinkedIn's alleged breach. Cal. Civ. Code § 3300. Put another way, LinkedIn's alleged *failure* to use industry standard security did not *cause* Plaintiff to pay her consideration to LinkedIn. That consideration is therefore not "resulting damages" of the alleged breach. (Dismissal Order at 7.) Instead, damages resulting from the use of unsalted, SHA-1 encryption of member passwords would be, for example, damages associated with identity theft or compromised accounts or personal information. For these reasons, Plaintiff's breach of contract claim fails as a matter of law.

**D.      Plaintiffs' Claims Should Be Dismissed With Prejudice.**

This is the third iteration of Plaintiff's complaint after consolidation. Plaintiff merely repleads the same flawed theories that this Court has already rejected, and allowing her to replead would be futile. Her claims should be dismissed with prejudice. *See Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (a "court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint") (citation and quotation omitted); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (leave to amend should not be granted where amendment would be futile).

**V.      CONCLUSION**

For the foregoing reasons, the Second Amended Complaint should be dismissed with prejudice for lack of standing and for failure to state a claim upon which relief can be granted.

Dated: June 13, 2013                    COOLEY LLP

                                        /s/ Matthew D. Brown
                                        Matthew D. Brown

                                        Attorneys for Defendant LinkedIn Corporation

1319911/SF

only when there has been a total breach—i.e., total failure of consideration or repudiation.") (italics in original; citations omitted); *id.* (quoting Joseph M. Perillo, et al., *Calamari and Perillo on Contracts* § 15.3 (6th ed. 2009) for the proposition that "[r]estitution is available as a remedy for total breach only, not for a partial breach . . . the non-breaching party must elect to cancel the contract"). Plaintiff has not pled any facts to support such a claim.