Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Ari J. Scharg (Admitted *Pro Hac Vice*)
ascharg@edelson.com
J. Dominick Larry (Admitted *Pro Hac Vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Samuel Lasser – SBN 252754
samlasser@hotmail.com
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero Street
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

Laurence D. King – SBN 206423
lking@kaplanfox.com
Linda M. Fong – SBN 124232
lfong@kaplanfox.com
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, California 94104
Tel: 415.772.4700

*Counsel for Plaintiff and the Putative Class*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE LINKEDIN USER PRIVACY LITIGATION | Case No. 12-cv-03088-EJD<br><br>**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: June 18, 2015<br>Time: 9:00 a.m.<br>Judge: Hon. Edward J. Davila<br>Action Filed: June 15, 2012 |

### NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that on June 18, 2015 at 9:00 a.m., or at such other time as may be set by the Court, Plaintiff Khalilah Wright will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of the class action settlement reached by Plaintiff and Defendant LinkedIn Corporation, in Courtroom 4, 5th Floor, 280 South 1st Street, San Jose, California 95113, before the Honorable Edward Davila.

The Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, oral argument of counsel, all documents in the record, the Northern District of California's Procedural Guidance for Class Action Settlements, and any other matter that may be submitted at the hearing.

### STATEMENT OF ISSUES PRESENTED

The issues presented by this Motion are:

1.      Is the settlement fair, adequate, and reasonable?

2.      Did the parties execute the approved notice plan so that the requirements of Rule 23, the Class Action Fairness Act, and due process are satisfied?

Dated: May 14, 2015

Respectfully Submitted,

KHALILAH WRIGHT, individually and on behalf of the Class of similarly situated individuals,

s/ Jay Edelson
_____

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Ari J. Scharg (Admitted *Pro Hac Vice*)
ascharg@edelson.com
J. Dominick Larry (Admitted *Pro Hac Vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Samuel Lasser – SBN 252754
samlasser@hotmail.com
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero Street
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

Laurence D. King – SBN 206423
lking@kaplanfox.com
Linda M. Fong – SBN 124232
lfong@kaplanfox.com
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, California 94104
Tel: 415.772.4700

*Counsel for Plaintiff and the Putative Class*

## Table of Contents

I. INTRODUCTION ................................................................. 1

II. TERMS OF THE SETTLEMENT AGREEMENT ........................................ 1

    A. Class Definition ................................................................ 2

    B. Monetary Relief ................................................................ 2

    C. Prospective Relief .............................................................. 2

    D. Payment of Notice and Settlement Administration Expenses .............. 3

    E. Incentive Award and Attorneys' Fees ..................................... 3

    F. Release ........................................................................ 3

III. THE NOTICE PLAN HAS BEEN EXECUTED SUCCESSFULLY AND
    SATISFIED DUE PROCESS ...................................................... 3

VI. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ........ 5

    A. The *Churchill* Factors All Weigh in Favor of
       Settlement Approval ......................................................... 6

        1. *The settlement is fair relative to the strength
          of Plaintiff's case* ........................................................ 7

        2. *The settlement is preferable to the risk, expense, and
          complexity of continued litigation* ................................. 7

        3. *The risk of maintaining class status favor approval of the
          settlement* ................................................................ 8

        4. *The settlement provides benchmark class relief* ............... 9

        5. *The parties had sufficient information to reach
          the settlement* .......................................................... 10

        6. *Experienced counsel recommend the settlement* ............. 11

        7. *Presence of a governmental party* .............................. 12

        8. *Reaction of class members* ....................................... 12

    B. The Settlement Is Not the Product of Collusion
       Between the Parties ......................................................... 13

VII. RESPONSE TO OBJECTIONS ..................................................... 14

VIII. CONCLUSION .................................................................... 16

1

**Table of Authorities**

2

**United States Court of Appeals Cases**

3

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ..........................*passim*

4

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)........................................5

5

*In re Bluetooth Headset Prods. Liab. Litig.*,

6

      654 F.3d 935 (9th Cir. 2011)................................................................ 6, 12, 13, 14

7

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015)..........................5

8

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) ............................................9

9

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629 (7th Cir. 2007) ..........................6

10

*Rannis v. Recchia*, 380 F. App'x 646 (9th Cir. 2010)........................................4

11

*Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011) ..........................................6

12

*Resnick v. AvMed, Inc.*, 693 F.3d 1317 (11th Cir. 2012) ....................................7

13

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ..........................13

14

*Silber v. Mabon,* 18 F.3d 1449 (9th Cir. 1994) ..............................................4

15

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010)..........................9

16

**United States District Court Cases**

17

*Bayat v. Bank of the W.*, No. C-13-2376 EMC,

18

      2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ................................................. 7, 8, 9

19

*Bellinghausen v. Tractor Supply Co.*, No. 13-cv-02377-JSC,

20

      2015 WL 1289342 (N.D. Cal. Mar. 20, 2015) ................................. 6, 8, 10, 11, 12

21

*Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ,

22

      2014 WL 2926210 (N.D. Cal. June 27, 2014) ............................................. 7, 8, 11

23

*Greenwood v. Compucredit Corp.*, No. 08-cv-4878,

24

      2010 WL 4807095 (N.D. Cal. Nov. 19, 2010)........................................... 9

25

*In re Google Buzz Privacy Litig.*, No. C 10-00672 JW,

26

      2011 WL 7460099 (N.D. Cal. June 2, 2011) ........................................... 9

27

*In re Heartland Payment Sys. Inc. Customer Data Sec. Breach Litig.*,

28

      851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................. 10

*In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-02522,

    dkts. 358-1, 364 (D. Minn. March 19, 2015) ...................................................... 10

*In re Toys R Us-Delaware, Inc.—Fair and Accurate Credit Transactions Act*

    *(FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) ................................................ 14

*Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115,

    2013 WL 3864341 (S.D. Cal. July 24, 2013) ...................................................... 10

*LaGarde v. Support.com, Inc.*, No. C 12-0609 JSC,

    2013 WL 1283325 (N.D. Cal. Mar. 26, 2013) .............................. 7, 8, 9, 10, 11, 12

*Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO,

    2014 WL 3404531 (N.D. Cal. July 11, 2014) ........................................ 7, 8, 11, 13

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA(WMC),

    2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ...................................................... 15

*Vincent v. Reser*, No. C 11-03572 CRB,

    2013 WL 621865 (N.D. Cal. Feb. 19, 2013) ...................................................... 13

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1715 ....................................................... 3, 5, 12

**Federal Rules**

Fed. R. Civ. P. 23 ......................................................................................... 3, 4, 5

**Other Sources**

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist*

    *and Plain Language Guide* (2010), *available at*

    http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf ....... 4

John Schwartz, *Victoria's Secret Reaches a Data Privacy Settlement,* N.Y. Times*,*

    Oct. 21, 2003, http://www.nytimes.com/2003/10/21/technology/21priv.html ..... 15

Press Release, Fed. Trade Comm'n, FTC Launches Redress Program for ChoicePoint

   Identity Theft Victims (Dec. 6, 2006), *available at* https://www.ftc.gov/news-

   events/press-releases/2006/12/ftc-launches-redress-program-choicepoint-

   identity-theft-victims ............................................................................. 15

## I.      INTRODUCTION

Plaintiff Khalilah Wright ("Plaintiff") respectfully requests that the Court grant final approval to the settlement reached with defendant LinkedIn Corporation ("Defendant" or "LinkedIn") resolving claims that LinkedIn failed to provide promised data security to the class of paying customers, as evidenced by a massive data breach. Though the claims were based on a novel and relatively untested "overpayment" theory of damages in data breach litigation, with the assistance of John B. Bates, Esq. of JAMS, Plaintiff was able negotiate a very favorable settlement for the class, resulting in direct monetary payments to class members in addition to valuable prospective relief correcting LinkedIn's alleged data security shortcomings. This stands in stark contrast to other—less favorable—privacy settlements that have been approved in this circuit and elsewhere, in which monetary relief went only to *cy pres* recipients, not class members. (*See* dkt. 122 at 1.) Here, while the settlement calls for the potential distribution of unclaimed funds to various *cy pres* recipients, the response from the class has been exceptional and the settlement fund will be fully exhausted by payments to class members.

After the Court granted preliminary approval on January 29, 2015, the parties and the settlement administrator diligently implemented the approved notice plan, and successfully delivered direct notice to the class. The overwhelmingly positive response from the class and the *de minimis* number of opt-outs and *pro se* objections is not surprising in light of the favorable relief afforded by the settlement. As explained more fully below, the settlement—negotiated with the assistance of a neutral third-party mediator—is eminently fair and reasonable, and is not the product of collusion between the parties. All the factors considered by the Ninth Circuit weigh in favor of granting final approval to the settlement, and Plaintiff respectfully requests that this Court do so.

## II.      TERMS OF THE SETTLEMENT AGREEMENT[1]

The terms of the settlement, which this Court preliminarily approved, are fully set forth in

---

[1]      The underlying facts, litigation history, and settlement efforts are fully set forth in Plaintiff's Motion for Reasonable Attorneys' Fees, Expenses, and Incentive Award. (Dkt. 141.) Pursuant to the Northern District of California's Procedural Guidance for Class Action Settlements, the case history and background facts are not repeated here.

the settlement agreement attached hereto as Exhibit 1 (the "Settlement Agreement" or "Agreement"), and briefly summarized below.

### A.   Class Definition

On January 29, 2015, this Court certified a class of "[a]ll persons in the United States who paid a fee to LinkedIn for a premium subscription at any time between March 15, 2006 and June 7, 2012" (Dkt. 136 at 2), which is the class covered by the Settlement Agreement (the "Settlement Class") (Agreement § 1.30).

### B.   Monetary Relief

Each member of the Settlement Class who has submitted a valid claim form is entitled to a *pro rata* share of the $1,250,000 settlement fund established by LinkedIn (the "Settlement Fund"), following payment of notice and administrative costs, attorneys' fees, and an incentive award. (Agreement § 2.1(a).) If the Settlement Agreement is approved, the *pro rata* amount each valid claimant will receive is approximately $14.81.[2] While the Agreement provides that any unclaimed amounts in the Settlement Fund will be distributed to various *cy pres* recipients (Agreement § 2.1(c)), payments to class members will exhaust the Settlement Fund, and that provision will therefore not come into effect.

### C.   Prospective Relief

LinkedIn has agreed to employ both salting and hashing, or equivalent or greater forms of data security, to protect LinkedIn users' passwords for a period of five (5) years. (Agreement § 2.2.) LinkedIn shall be responsible for all costs associated with the implementation of this relief.

---

[2]   After payment of notice costs, attorneys' fees, and an incentive award (assuming Court approval of the amounts requested for the latter two), there will be $700,891.33 in the Settlement Fund to pay class member claims. As of the claims deadline, exactly 47,336 valid claims had been timely submitted (*see* Declaration of Stefanie C. Gardella attached hereto as Exhibit 2; Declaration of Adam Weinstein attached hereto as Exhibit 3), resulting in a *pro rata* amount of $14.81 for each claimant. However, pursuant to the terms of the settlement, individuals submitting invalid claims have been provided notice that their claims were rejected and an opportunity to remedy any curable deficiency. (*See* Agreement § 5.2.) Depending on how many claimants are able to remedy a deficient claim (if any), the *pro rata* payment amount may decrease slightly. The number of deficiency-curing claimants, and thus, the *pro rata* amount to be paid to all claimants, will be known by—and can be reported to the Court at—the final approval hearing.

1    (*Id.*)

2    **D.     Payment of Notice and Settlement Administration Expenses**

3        The costs of notice and settlement administration are being paid from the Settlement Fund.

4 (Agreement §§ 1.27, 1.32.) While the Settlement Agreement contemplated up to $180,000 in such

5 costs (*id.*), only $140,000 will be paid from the Settlement Fund, a savings of more than 22% that

6 will be used to pay class member claims.

7    **E.     Incentive Award and Attorneys' Fees**

8        In its preliminary approval order, this Court appointed plaintiff Khalilah Wright as class

9 representative, and her counsel as class counsel. (Dkt. 136 at 2.) The Settlement Agreement

10 provides that any incentive award and attorneys' fees awarded to Ms. Wright by this Court will be

11 paid from the Settlement Fund. (Agreement §§ 1.32, 8.) Plaintiff has separately petitioned this

12 Court for an incentive award of $7,500 and attorneys' fees and expenses of $401,608.67. (Dkt.

13 141.)

14    **F.     Release**

15        In exchange for the relief described above, the Defendant, and each of its related and

16 affiliated entities (the "Released Parties" defined in the Settlement) will receive a full release of all

17 claims arising out of or related to LinkedIn's representations about the security of its users'

18 personal information, passwords, or data in its User Agreement or Privacy Policy and the 2012

19 data breach that resulted in the June 6, 2012 posting of users' passwords online. (*See* Agreement

20 §§ 1.24–1.26 for full release language.)

21 **III.   THE NOTICE PLAN HAS BEEN EXECUTED SUCCESSFULLY AND SATISFIED DUE PROCESS**

22

23        As part of granting final approval to the Settlement Agreement, the Court must determine

24 whether the notice provided to the class was "the best notice that is practicable under the

25 circumstances, including individual notice to all members who can be identified through

26 reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).[3] Such notice must "clearly and concisely state in

27        [3] The Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715 also required sending the U.S.

28 Attorney General, the Attorneys General of each of the 50 States and the District of Columbia

1   plain, easily understood language," the nature of the action, the class definition, and class

2   members' right to exclude themselves from the class, among other things. *Id*. Further, before

3   granting final approval to a proposed class settlement, the court must "direct notice in a reasonable

4   manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

5   While Rule 23 requires that reasonable efforts be made to reach all class members, it does not

6   require that each individual actually receive notice. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir.

7   1994); *see also Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010). The Federal Judicial

8   Center has suggested that a notice plan that reaches at least 70% of the class is reasonable. Federal

9   Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language*

10  *Guide* at 3 (2010), *available at*

11  http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.

12      Here, this Court approved the notice plan set forth in the Settlement Agreement, which

13  called for direct notice by e-mail to all members of the Settlement Class to the addresses used in

14  connection with their LinkedIn premium accounts, as well as the creation of a detailed settlement

15  website (the "Notice Plan"). (Dkt 136 at 4; Agreement § 4.1.) The Court-approved Notice Plan

16  also specified the content of the notices, which used simple, plain language to encourage

17  readership and comprehension. (Agreement § 4.1 and Exs. B, C.) The settlement website allowed

18  class members to file a claim online, and the e-mail notice was twice sent to class members and

19  included a link to the online claim form. (Agreement § 4.1.)

20      In approving the Notice Plan, this Court held that "[t]he Notice Plan is consistent with the

21  requirements of Rule 23 and due process, and constitutes the best notice practicable under the

22  circumstances." (Dkt. 136 at 3.) Specifically, this Court found that the Notice Plan "is reasonably

23  calculated to, under all circumstances, apprise the members of the Settlement Class of the

24  pendency of this action, the certification of the Settlement Class, the terms of the Settlement

25  Agreement, and the right of members to object to the settlement or to exclude themselves from the

26  Class." (*Id.*) The Court then appointed Kurtzman Carson Consultants LLC ("KCC") as the

27  _____

28  copies of the Settlement and other documents related to this case. The required CAFA notice was
    sent on August 22, 2014. (Gardella Decl. ¶¶ 3–4.)

1   settlement administrator. (*Id.*)

2        KCC and the parties have diligently followed the Court-approved Notice Plan. On

3   February 18, 2015, KCC established the settlement website at

4   www.LinkedInClassActionSettlement.com, which included all relevant Court documents and the

5   ability to file claims on-line. (Gardella Decl. ¶ 8.) The settlement website has had over 100,000

6   unique visitors. (*Id.* ¶ 10.) Also on February 18, 2015, KCC set up toll-free telephone line where

7   class members could obtain information and obtain a copy of the court-approved notice and claim

8   form upon request. (*Id.* ¶ 7.) Then, on February 20, 2015, and again on March 30, 2015, LinkedIn

9   emailed the Court-approved summary notice to all 797,757 class members. (Declaration of Jacob

10  Bailey ¶¶ 3–7, a copy of which is attached as Exhibit 4.) LinkedIn confirmed that 97% of the class

11  successfully received the first email and 96% of the class successfully received the second one.

12  (*Id.* at 5–7.) Ultimately, the Court-approved notice plan was exceptionally successful in both

13  reaching class members, but in informing them of the terms of the Settlement. As such, it fully

14  complied with due process, Rule 23, and CAFA.

15  **VI.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

16        Before approving a class action settlement, this Court must hold a hearing and find the

17  settlement "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Online DVD-Rental*

18  *Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015). The Ninth Circuit has recognized "the strong

19  judicial policy that favors settlements, particularly where complex class litigation is concerned,"

20  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), and "[i]t is the settlement

21  taken as a whole, rather than the individual component parts, that must be examined for overall

22  fairness," *Online DVD-Rental*, 779 F.3d at 944. To assess the fairness of a settlement, courts look

23  to the eight so-called *Churchill* factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely
> duration of further litigation; (3) the risk of maintaining class action status throughout
> the trial; (4) the amount offered in settlement; (5) the extent of discovery completed
> and the stage of the proceedings; (6) the experience and view of counsel; (7) the
> presence of a governmental participant; and (8) the reaction of the class members to
> the proposed settlement.

*Online DVD-Rental*, 779 F.3d at 944. (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). In addition, where—as here—the parties reached a settlement prior to formal class certification, "[t]he district court's approval order must show not only that it has explored the *Churchill* factors comprehensively, but also that the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (internal quotations omitted). Here, as explained below, each of the *Churchill* factors weigh in favor of final approval of the settlement, and the settlement was not the product of collusion between the parties.

**A.      The *Churchill* Factors All Weigh In Favor of Settlement Approval.**

**1.      *The settlement is fair relative to the strength of Plaintiff's case*.**

The first *Churchill* factor—the strength of Plaintiff's case—weighs in favor of settlement approval here, because ultimate success on the merits was never guaranteed. In assessing the strength of a plaintiff's case, "there is no 'particular formula by which th[e] outcome must be tested.'" *Bellinghausen v. Tractor Supply Co.*, No. 13-cv-02377-JSC, 2015 WL 1289342, at *5 (N.D. Cal. Mar. 20, 2015) (quoting *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)). Rather, "the Court's assessment of the likelihood of success is 'nothing more than an amalgam of delicate balancing, gross approximations and rough justice.'" *Id.* (quoting *Rodriguez*, 563 F.3d at 965). Here, while Plaintiff is confident that she would ultimately have prevailed had litigation continued, her case was not clear-cut.

Generally, victims of data breaches have been unable to recover damages unless they have losses directly attributable to actual identity theft resulting from the breach. *See, e.g.*, *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (affirming dismissal of data breach claim because, "[u]nless and until" hackers misuse information from a data breach, consumers "have not suffered any injury"); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 639 (7th Cir. 2007) (collecting various "information loss[]" cases standing for "the same basic premise: Without more than allegations of increased risk of future identity theft, the plaintiffs have not suffered a harm that the law is prepared to remedy"). Consequently, Plaintiff here proceeded on a relatively novel theory of liability and damages in a data breach case: that LinkedIn promised—and class members paid

for—"industry standard" data security, which LinkedIn failed to provide. *Cf. Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1328 (11th Cir. 2012) (accepting overpayment theory of liability in data breach case). Her claim asserts not that class members were necessarily harmed by the data breach, but that they overpaid for their premium LinkedIn subscriptions because they did not receive promised data security (as evidenced by the data breach).

In addition to requiring this Court's acceptance of her overpayment theory, to survive summary judgment and succeed at trial Plaintiff would need to establish both what constitutes "industry standard" data security, and the amount of the total LinkedIn subscription price that constituted payment for such data security. Both of these proofs would have entailed a "battle of the experts," the outcome of which is in no way guaranteed.

Consequently, because ultimate success at trial is far from certain, the first *Churchill* factor supports settlement approval. *See Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at *3 (N.D. Cal. Apr. 15, 2015) ("Because the strength of Plaintiffs' claims is in doubt, the first *Churchill Village* factor tips in favor of final approval of the settlement."); *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *4 (N.D. Cal. July 11, 2014) (finding first *Churchill* factor weighed in favor of settlement approval in light of "significant risks that lie ahead through summary judgment and trial").

### 2. *The settlement is preferable to the risk, expense, and complexity of continued litigation.*

The second *Churchill* factor—the risk, expense, complexity, and likely duration of further litigation—also weighs in favor of settlement approval. "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) (internal quotations omitted). Immediate receipt of money through settlement—even if lower than what could potentially be achieved through ultimate success on the merits—has value to a class, especially when compared to risky and costly continued litigation. *See LaGarde v. Support.com, Inc.*, No. C 12-0609 JSC, 2013 WL 1283325, at *4 (N.D. Cal. Mar. 26, 2013) ("In light of the risks and costs of continued litigation, the immediate rewards to class

members are preferable."); *Bellinghausen*, 2015 WL 1289342, at *6 ("Although Plaintiffs might have received more if they proceeded through litigation and prevailed on the merits . . . the benefit of receiving this money sooner rather than later has its own value.").

Here, continued litigation would be both risky and costly. First, the hurdles to ultimate success on the merits noted above make the outcome of continued litigation uncertain, and present "a significant risk that litigation might result in a lesser recover[y] for the class or no recovery at all." *Bellinghausen*, 2015 WL 1289342, at *5.

Second, continued litigation would be costly, in terms of both time and money. *See Ching*, 2014 WL 2926210, at *4 (noting that this *Churchill* factor looks to "the probable costs, in both time and money, of continued litigation"). LinkedIn has steadfastly maintained that it would vigorously defend this case to judgment and beyond. (Dkt. 141 at 4.) Continued litigation would thus involve significant fact and expert discovery into, among other things, technical issues such as what constitutes standard industry security practices and whether LinkedIn followed such standards, as well as summary judgment briefing on those questions. *See LaGarde*, 2013 WL 1283325, at *4 (*Churchill* factor met where continued litigation would turn on resolution of complicated factual issues regarding technical design and functionality of software); *Bayat*, 2015 WL 1744342, at *4 ("Absent settlement, the costs and complexity of this case will certainly increase as [motion practice] (along with associated discovery) will need to be litigated."). In addition, the losing party is likely to appeal, further raising the costs in terms of both time and money. *See Bayat*, 2015 WL 1744342, at *4 ("[R]egardless of who prevails on the merits of [a contested issue], the losing party would likely appeal, thus significantly prolonging this litigation and increasing its expense and complexity.") Avoiding unnecessary discovery, motion practice, and appeals benefits not just the parties, but also this Court. *See Larsen*, 2014 WL 3404531, at *4 ("Avoiding such unnecessary and unwarranted expenditure of resources and time would benefit all parties, as well as conserve judicial resources."); *Ching*, 2014 WL 2926210, at *3 (same).

Consequently, because continued litigation would be risky, costly, complex, and long, the second *Churchill* factor favors settlement approval.

### 3.   *The risk of maintaining class status favor approval of the settlement.*

The third *Churchill* factor—the risk of maintaining class action status throughout the trial—likewise weighs in favor of approving the settlement. From the outset of this litigation, LinkedIn has challenged the ability of Plaintiff to proceed on a class basis. (*See, e.g.*, dkt. 101 at 12–13, 21.) And, while this case could potentially present individual issues regarding reliance on LinkedIn's alleged misrepresentations and/or the amount that each class member overpaid for their LinkedIn subscription, neither are usually sufficient to defeat certification. *See, e.g.*, *Greenwood v. Compucredit Corp.*, No. 08-cv-4878, 2010 WL 4807095, at *5 (N.D. Cal. Nov. 19, 2010) (holding that where all class members received same alleged misrepresentations, reliance is presumed, and thus "individualized issues of reliance do not overcome the predominance of common issues in [such a] case"); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (holding that individual nature of damages does not defeat class certification). While this Court held that such issues do not predominate over the questions common to all class members and certified a class for settlement purposes, (dkt. 136 at 2), there is a chance that, should litigation continue and LinkedIn opposes class certification, the action would not be maintained as a class. Consequently, this *Churchill* factor weighs in favor of settlement approval. *See, e.g.*, *LaGarde*, 2013 WL 1283325, at *5; *Bayat*, 2015 WL 1744342, at *4.

### 4. *The settlement provides benchmark class relief.*

The fourth *Churchill* factor—the amount offered in settlement—"is generally considered the most important." *Bayat*, 2015 WL 1744342, at *4. Here, in addition to the important prospective relief correcting the alleged data protection deficiencies, class members who submitted valid claims will each receive approximately $14.81 from the Settlement Fund. The fact that class members are receiving *any* cash benefit is remarkable, given that recovery in many settlements of data breach and privacy class actions is limited to *cy pres* payments, credit monitoring, or reimbursement only for proven losses resulting from identity theft even when significant statutory damages are available. *Lane v. Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012) *cert. denied*, 134 S. Ct. 8 (2013) (approving settlement providing a $9.5 million *cy pres* payment as the sole monetary relief in case where statutory damages of up to $10,000 per claim were available); *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3–

5 (N.D. Cal. June 2, 2011) (approving settlement providing an $8.5 million *cy pres* payment as the sole monetary relief in case where statutory damages of up to $10,000 per claim were available); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-02522, dkts. 358-1, 364 (D. Minn. March 19, 2015) (preliminarily approving settlement providing $10 million to pay claims related to identity theft in data breach affecting 40 million consumers who may only receive money from the settlement fund if they suffered a loss directly attributable to the breach, such as unreimbursed unauthorized charges to their credit card or costs to correct their credit report); *Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115, 2013 WL 3864341, at *2 (S.D. Cal. July 24, 2013) (establishing a $2.5 million fund to provide class members with two years of credit monitoring and identity theft reimbursement); *In re Heartland Payment Sys. Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1049 (S.D. Tex. 2012) (establishing a $2.4 million fund from which to provide over 100 million class members with identity theft reimbursement).

Further, the $14.81 per claimant represents a significant portion of the recovery that class members could expect if they were to achieve total victory at trial. As explained on preliminary approval, the expected recovery at trial is between $5 and $50 per injured class member. (Dkt. 122 at 18.) This means that class members are receiving at least 30% of (and potentially up to three times) what they could expect to receive at trial, which is an excellent result weighing in favor of settlement approval. *See Bellinghausen*, 2015 WL 1289342, at *6–7 (stating that it is "well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to class members at trial," and approving settlement representing between 11% and 27% of potential recovery); *Larsen*, 2014 WL 3404531, at *4 (approving settlement representing 50% of potential recovery).

### 5.   *The parties had sufficient information to reach the settlement.*

The next *Churchill* factor— the extent of discovery completed and the stage of the proceedings—"evaluates whether 'the parties have sufficient information to make an informed decision about settlement.'" *Larsen*, 2014 WL 3404531, at *5 (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)). Formal discovery is not a requirement for final settlement approval; "[r]ather, the court's focus is on whether the parties carefully investigated the

1    claims before reaching a resolution." *Bellinghausen*, 2015 WL 1289342, at *7 (internal quotation

2    omitted). Here, the parties carefully investigated the claims before settling, and had sufficient

3    information to make an informed decision.

4           Specifically, the settlement comes after almost three years of litigation, which included the

5    formal and informal exchange of documents, briefing on two motions to dismiss, consultation with

6    and a declaration from an expert, formal mediation before a third-party neutral, extensive

7    mediation briefing, and several months of settlement negotiations. (*See* dkt. 141 at 3–5.) All of this

8    information allowed the parties to make reasoned and informed settlement decisions, and this

9    factor thus supports final settlement approval. *See Bellinghausen*, 2015 WL 1289342, at *7 (factor

10   supported approval where parties had litigated multiple motions to dismiss, engaged in formal and

11   informal discovery, produced and analyzed hundreds of pages of documents, prepared detailed

12   mediation briefs, and participated in mediation); *LaGarde*, 2013 WL 1283325, at *7 (factor

13   supported approval where plaintiff had presented technology expert's conclusions to defendant

14   and parties had engaged in limited motion practice).

15          **6.    *Experienced counsel recommend the settlement.***

16          The sixth *Churchill* factor—the experience and view of counsel—also weighs in favor of

17   final settlement approval. Class counsel has extensive experience prosecuting and settling class

18   actions, including in the field of consumer privacy. (Dkt. 141-1 ¶ 18.) Further, class counsel has

19   been litigating *this* case for several years. (*See id.* ¶¶ 6–12). As other courts have noted, "[t]he

20   opinions of counsel should be given considerable weight both because of counsel's familiarity

21   with this litigation and previous experience with cases." *Larsen*, 2014 WL 3404531, at *5; *Ching*,

22   2014 WL 2926210, at *5. On the other side of this action were highly qualified counsel from

23   Cooley LLP who vigorously defended their client, but nevertheless agreed that the terms of the

24   settlement are preferable to continued litigation. (Agreement, Rec. O.) Here, class counsel believes

25   the settlement is in the best interests of the class, especially in light of the potential risks and

26   rewards of continued litigation. (Dkt. 141-1 ¶ 19.) Consequently, this factor supports final

27   approval of the settlement. *Bellinghausen*, 2015 WL 1289342, at *8 ("Class counsel believes the

28   settlement properly balances the monetary exposure that the class stands to gain with the

1   magnitude of risk of continued litigation—at bottom, that the settlement is fair, adequate and

2   reasonable . . . . Given counsel's experience in this field, his assertion . . . support[s] final approval

3   of the settlement.") (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

### 7.   *Presence of a governmental party*.

5   The next *Churchill* factor looks to the presence of a governmental party. Over a year and a

6   half before the settlement, the United States moved to intervene and temporarily stay discovery for

7   a reason unrelated to the dispute between the parties. (Dkt. 66.) Aside from that, however, there

8   has been no involvement of any federal or state government in this litigation. Further, consistent

9   with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, notice of the proposed

10  settlement was provided to appropriate state and federal officials. (Gardella Decl. ¶¶ 4–5.) None of

11  these officials have raised any objection or concern regarding the settlement, (*id.* ¶ 6), which

12  weighs in favor of settlement approval,[4] *See LaGarde*, 2013 WL 1283325, at *7 ("CAFA

13  presumes that, once put on notice, state or federal officials will raise any concerns that they may

14  have during the normal course of class action settlement procedures."); *Bellinghausen*, 2015 WL

15  1289342, at *8 (same).

### 8.   *Reaction of class members*.

17  The final *Churchill* factor—the reaction of class members—likewise supports final

18  approval of the settlement. "Courts have repeatedly recognized that the absence of a large number

19  of objections to a proposed class action settlement raises a strong presumption that the terms of the

20  proposed class settlement action are favorable to the class members." *Bellinghausen*, 2015 WL

21  1289342, at *8. Thus, this Court "may appropriately infer that a class action settlement is fair,

22  adequate, and reasonable when few class members object to it." *Id.*

23  Here, out of approximately 798,000 class members, 47,336 have submitted valid claims,

24  only 57 have timely opted out, (Gardella Decl. ¶¶ 10–11), and only six have filed objections, (dkts

---

26  [4] To be clear, by pointing out that no Attorneys General, state or federal, have filed objections
27  to the Settlement, Plaintiffs do not mean to imply that those officials have endorsed the Settlement
    in any way. All that is meant by the statement is simply that no objections have been filed by the
28  relevant governmental agencies.

137–40, 142, 144.).[5] These numbers show an overall exceptionally positive reaction by the class, which supports final approval. *See, e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (approving district court's finding of "favorable reaction" to settlement where, 52,000 class members submitted claims and 54 objected); *Larsen*, 2014 WL 3404531, at *5 (finding "positive response" where nearly 60,000 class members submitted claims, 23 opted out, and 16 objected). Consequently, all eight *Churchill* factors weigh in favor of granting final approval to the settlement.

### B.       The Settlement Is Not the Product of Collusion Between the Parties.

In addition to examining the eight *Churchill* factors, when a settlement is reached prior to formal class certification the Court must ensure that the settlement is not the product of collusion. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47. This Court has already once concluded that the settlement—reached with the assistance of a neutral mediator—was non-collusive. (Dkt. 136 at 3 ("The Court . . . finds that the Settlement Agreement . . . is the result of serious, informed, non-collusive arms' length negotiations involving experienced counsel familiar with the legal and factual issues of this case and made with the assistance of John B. Bates, Jr. of JAMS . . . .").) *See also Vincent v. Reser*, No. C 11-03572 CRB, 2013 WL 621865, at *4 (N.D. Cal. Feb. 19, 2013) (finding assistance of mediator in reaching settlement "strongly suggest[ed]" that settlement was free of collusion). In addition, while the Ninth Circuit has identified three "signs" of a potentially collusive settlement, *Bluetooth*, 654 F.3d at 947, none of those signs are present here.

The first *Bluetooth* sign—"when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," 654 F.3d at 947—is absent here. Over $700,000 is being directly distributed to class members. On the other hand, class counsel is seeking only $375,000 in fees and less than $27,000 in costs, which collectively represent just 32% of the settlement fund. (Dkt. 137 at 1.) Such a request is well in line with similar settlements that have been approved by courts in the Ninth

---

[5] Two additional opt-outs were submitted after the opt-out deadline. (Gardella Decl. ¶ 11.)

Circuit, (*see id.* at 13), and is not a disproportionate distribution of the settlement. *Cf. Bluetooth*, 654 F.3d at 947 (expressing concern over attorneys' fees that were eight times the monetary *cy pres* relief afforded a class).

Nor is the second *Bluetooth* factor—the existence of a "clear sailing" agreement, 654 F.3d at 947—present here. A clear sailing agreement is an agreement "where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *In re Toys R Us-Delaware, Inc.—Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014). Here, not only did LinkedIn expressly reserve the right to contest class counsel's fee request, (Agreement § 8.1), it has actually done so, (dkt. 143.)

Finally, the third *Bluetooth* factor—an agreement that the fees requested but not awarded revert to the defendants rather than be added to the class fund, 654 F.3d at 947—is likewise absent here. To the extent this Court denies any part of Plaintiff's fee request, those funds remain part of the settlement fund to be distributed to class members, no amount of which reverts to LinkedIn.

Consequently—and not surprisingly given the assistance of a third-party mediator in reaching it—the settlement displays none of the *Bluetooth* signs suggesting a collusive agreement. That, in conjunction with consideration of the eight *Churchill* factors discussed above, supports granting final approval to the settlement.

## VII.    RESPONSE TO OBJECTIONS

Finally, pursuant to the Northern District of California's Procedural Guidance for Class Action Settlements, Plaintiff briefly responds to the arguments raised by the six *pro se* objectors to the settlement, all of which are without merit and do not warrant denial of final settlement approval.

First, several of the objectors complain that the individual settlement amount is too low. (Dkts. 137, 138, 139, 140, 142.) As explained above, however, data breach victims have generally had difficulty recovering *any* damages unless they have losses directly attributable to actual identity theft resulting from the breach, and Plaintiff thus proceeded on an overpayment theory. This overpayment theory—that LinkedIn premium customers paid for data security that they did

not receive—allows all class members to recover even though their exposed information may never have actually been misused. None of the objectors claim that they were the victims of identity theft (and have corresponding damages), and thus would not be able to recover absent the overpayment theory. Further, as explained above, the $14.81 that each valid claimant is expected to receive represents a significant recovery for settlement of the overpayment claims here in light of anticipated recovery at trial of only $5–$50. Consequently, the objections based on the settlement amount should be rejected. *See, e.g.*, *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA(WMC), 2012 WL 5392159, *9 (S.D. Cal. Nov. 5, 2012) (rejecting objection based on size of individual settlement recovery because objectors "d[id] not recognize that the damages each class member suffered were themselves very small").[6]

Second, several of the objectors complain about the requested attorneys' fees. (Dkt. 138, 139, 140, 144). These objectors simply assert that the requested fees are excessive, however, without offering any reasons why.[7] To the contrary, for the reasons explained in Plaintiff's fee petition (which was posted on the settlement website), the requested fees are reasonable and appropriate. (Dkt. 141.) Indeed, while one objector suggests that fees be awarded not on a percentage basis, but rather based on "billable hours spent," (dkt. 139), the requested fees are

---

[6]   One objector, David Ferreira, cites two data breach settlements that he suggests resulted in payments of around $90 per customer. (Dkt. 140.) Mr. Ferreira appears to misunderstand those settlements, however, both of which were settlements of government enforcement actions, not civil lawsuits brought by private consumers and neither of which resulted in $90 payments to consumers. In the *ChoicePoint* settlement he cites, only $5 million of the $15 million total settlement paid to the FTC went to pay consumer claims, and even that money was only "to be used to reimburse consumers *for expenses due to identity theft caused by ChoicePoint's security breach*." Press Release, Fed. Trade Comm'n, FTC Launches Redress Program for ChoicePoint Identity Theft Victims (Dec. 6, 2006), *available at* https://www.ftc.gov/news-events/press-releases/2006/12/ftc-launches-redress-program-choicepoint-identity-theft-victims (emphasis added). In the *Victoria's Secret* settlement he cites, the $50,000 was a fine paid to the state of New York, not the 560 victims of the data breach. John Schwartz, *Victoria's Secret Reaches a Data Privacy Settlement,* N.Y. Times, Oct. 21, 2003, http://www.nytimes.com/2003/10/21/technology/21priv.html. Of the 560 victims, only three received full refunds of their purchases in the transactions whose security was breached, and 26 received Victoria's Secret gift certificates. *Id.*

[7]   LinkedIn's cursory opposition to the fee petition likewise fails to explain why it believes the requested amount is excessive. (*See* dkt. 143.)

1    actually *less* than class counsel's lodestar in this case. (Dkt. 141 at 14–17.)  Thus, this objection

2    lacks merit as well.

3        Finally, two objectors raise concerns about the *cy pres* component of the settlement. (Dkts.

4    139, 142.) But as explained above, the *cy pres* provision of the Settlement Agreement will not be

5    triggered because the settlement fund will be exhausted by payments to class members, rendering

6    these objections moot.

7    **VIII.  CONCLUSION**

8        Because (1) notice of the settlement was properly disseminated to the class, (2) the eight

9    *Churchill* factors all support final approval of the settlement, (3) the settlement is not the product

10   of collusion between the parties, and (4) the few objections to the settlement are all without merit,

11   this Court should grant final approval to the settlement.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: May 14, 2015

Respectfully Submitted,

**KHALILAH WRIGHT**, individually and on behalf of the Class of similarly situated individuals,

 s/ Jay Edelson

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Ari J. Scharg (Admitted *Pro Hac Vice*)
ascharg@edelson.com
J. Dominick Larry (Admitted *Pro Hac Vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Samuel Lasser – SBN 252754
samlasser@hotmail.com
LAW OFFICE OF SAMUEL LASSER
1934 Divisadero Street
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

Laurence D. King – SBN 206423
lking@kaplanfox.com
Linda M. Fong – SBN 124232
lfong@kaplanfox.com
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, California 94104
Tel: 415.772.4700

*Counsel for Plaintiff and the Putative Class*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on May 14, 2015, he caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: May 14, 2015                                        EDELSON PC

By: s/ Jay Edelson